**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
TARA WINNICKI, et al.,                  :
                                        :
                Plaintiffs,             :
                                        :          Civil Action No. 01-3357 (JAG)
                        v.              :
                                        :              **OPINION**
BENNIGAN'S, et al.,                     :
                                        :
                Defendants.             :
_____:


**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion of Defendant Steak & Ale of New

Jersey, Inc.[1] ("Steak & Ale" or "Defendant") to bar the testimony of Plaintiffs' expert, Alexandru

Constantinescu, M.D. ("Dr. Constantinescu" or "Plaintiffs' expert"), pursuant to Federal Rules of

Evidence 702 ("Rule 702") and 403, and the reliability factors set forth in Daubert v. Merrell

Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ("Daubert").  Defendant also moves for

summary judgment.  For the reasons set forth below, Defendant's motions will be denied.

### BACKGROUND

Plaintiffs Raymond and Kathleen Winnicki are the parents of decedent Plaintiff, Tara

Winnicki ("Tara"), (collectively, "Plaintiffs"), who died December 27, 2003, at the age of 21.

(Pls.' 56.1 Statement of Material Facts ("Pls.' Statement"), at ¶¶ 1, 33.)  Plaintiffs have brought

_____

[1]Improperly referred to as Bennigan's, Bennigan's Grill and Tavern, and Metromedia
Restaurant Group.  (Def.'s Notice of Removal.)

suit against the defendants, claiming that Tara's kidney failure was a result of dehydration stemming from food poisoning, which she had contracted after eating a Caesar salad at Bennigan's Restaurant, the night before she became sick.

The following facts are a brief synopsis of the events that led to Tara's death.[2]  On June 25, 1999, Tara, a healthy teenager, went to dinner with some friends at Bennigan's Restaurant in North Brunswick, New Jersey.  For dinner, she ate a Caesar salad (the "salad") with no chicken and drank a Dr. Pepper.  Tara and her friends left the restaurant between 7:00 p.m. and 7:30 p.m. Early the next morning, as Tara and her family began their trip to Florida, she felt nauseous and had some stomach pain.  Later that day she threw up, developed diarrhea, and then continued to throw up as the trip progressed.  The family stopped in Virginia for the night.  Tara continued to throw up, and the next morning her mother took her to Mary Washington Hospital.  Her medical records indicate that she was dehydrated and azotemic, and tests revealed elevated levels of creatinine and blood urea nitrogen.  She was found to be in renal failure and was transferred to Inova Fairfax Hospital ("Inova").  At Inova, she was diagnosed with acute renal cortical necrosis with acute renal failure, and was started on hemodialysis on July 1, 1999, in preparation for transfer to Robert Wood Johnson University Hospital in New Brunswick, New Jersey.  She was transferred on July 2, 1999, and remained at the hospital until July 10, 1999.  She was discharged with instructions to follow up with peritoneal dialysis training and treatment.

On July 11, 2000, Tara underwent kidney transplant surgery and received one of her mother's kidneys.  The kidney transplant failed, and Tara was subsequently diagnosed with peritonitis and end-stage renal disease in November of 2000.  From November 2000 until her

_____

[2]This synopsis is composed of facts from Plaintiffs' and Defendant's 56.1 Statements.

death in 2003, she received daily dialysis, and medical and surgical attention for a multitude of problems related to her end-stage renal disease.

## Dr. Constantinescu

Plaintiffs' proposed expert, Dr. Constantinescu, is a pediatric nephrologist[3] who began treating Tara in 1999.  (Def.'s 56.1 Statement ("Def.'s Statement"), at ¶¶ 44-45.)  Dr. Constantinescu is board certified in pediatric nephrology.  (Pls.' Statement ¶ 36, Ex. F.)  Dr. Constantinescu served as an attending pediatric nephrologist at Robert Wood Johnson University Hospital, and at St. Peter's Medical Center in New Brunswick, New Jersey, from 1995 to 2002.  (Pls.' Statement ¶ 36, Ex. F.)  He also served as the Medical Director of Pediatric Transplant Nephrology at Robert Wood Johnson University Hospital from 1998 to 2002.  (Pls.' Statement ¶ 36, Ex. F.)  He has taught, lectured, and published numerous articles and abstracts (published and presented) within his field.[4]  (Pls.' Statement ¶ 36, Ex. F.)

At his deposition, Dr. Constantinescu testified that when Tara became his patient either he or his associate took her medical history.  (Declaration of Richard D. Millet dated Oct. 21, 2005 ("Millet Decl."), at ¶ 9, Ex. H at 16:22-17:1.)  He testified that he reviewed the hospital records of the two hospitals in Virginia (Mary Washington Hospital and Inova), where Tara was

---

[3]The science of nephrology addresses the structure, functions, and diseases of the kidneys. See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993).  Pediatric nephrologists diagnose, treat, and manage disorders affecting the kidney and urinary tract, including kidney failure, and abnormalities in the urine, such as blood and protein, among others.  See What is a Pediatric Nephrologist, American Academy of Pediatrics (2002), http://www.aap.org/family/WhatisPedNephrologist.pdf.

[4]Dr. Constantinescu's qualifications as a pediatric nephrologist are not at issue in this matter.

admitted in June of 1999. (Millet Decl. ¶ 9, Ex. H at 7:20-25.) He also testified that he reviewed the work-up that was performed by previous physicians, and did not conduct additional testing when Tara first became his patient because she was already in severe renal failure. (Millet Decl. ¶ 9, Ex. H at 11:9-14.)

Dr. Constantinescu does not claim to be an expert in the field of food handling or infectious disease.[5] (Def.'s Statement ¶ 46, Ex. H at 23:3-7.) At his deposition, he testified that he does know what was specifically wrong with the Caesar salad Tara ate the evening before she became sick. (Millet Decl. ¶ 9, Ex. H at 29:10-30:4.) He testified that the abrupt onset and acute symptoms of Tara's gastrointestinal dysfunction was most likely caused by something she ingested within a short period of time (i.e., within twelve to eighteen hours), which indicates the salad. (Millet Decl. ¶ 9, Ex. H at 25:5-26:4; 28:7-13; 57:11-21; see also Millet Decl. ¶ 12, Ex. K.) He also testified that he is not aware of what she ate during the week before her illness, other than the salad at Bennigan's. (Millet Decl. ¶ 9, Ex. H at 21:25-22:12; 23:16-25.) In his opinion, food poisoning caused by a bacteria (i.e., Staphylococcus or E. coli) could have caused Tara's gastrointestinal dysfunction. (Millet Decl. ¶ 9, Ex. H at 30:16-32:4; see also Millet Decl. ¶ 10, Ex. I.)

Dr. Constantinescu testified at his deposition that Staphylococcus or E. coli, and possibly some viruses, can exhibit or incubate themselves within a ten hour period. (Millet Decl. ¶ 9, Ex. H at 31:16-32:4; 38:13-20.) In his opinion, the course of Tara's disease, and the fact that she developed hemolytic uremic syndrome ("HUS") post-transplant, suggests that the cortical

---

[5]Defendant has argued that these are the two specialities most important to resolving the issue of causation that arises here. However, while retaining an expert with expertise in infectious disease, defendant has not retained a food handling expert.

4

necrosis she suffered could have been a very severe stage of HUS, although without all of the features of HUS (i.e., it was atypical HUS).  (Millet Decl. ¶ 9, Ex. H at 28:7-24.)

At his deposition, Dr. Constantinescu testified that in his field of specialization, it is common for him to render differential diagnoses concerning his patients based on: all available laboratory data, the patient's history, and historical information contained in transferring hospital's records.  (Millet Decl. ¶ 9, Ex. H at 52:23-53:16.)  He testified that he performed a differential diagnosis or "diagnosis of exclusion" in reaching his conclusions regarding the cause of Tara's illness.  (Millet Decl. ¶ 9, Ex. H at 56:14-22; 57:4-10; see also Millet Decl. ¶ 13, Ex. L.)  In his opinion, the most likely cause of Tara's initial vomiting was the unwholesome salad that she ate at Bennigan's.[6]  (Millet Decl. ¶ 9, Ex. H at 52:4-17; 57:11-21.)

Dr. Constantinescu has authored six reports[7] concerning his opinions regarding Tara's illness, its sequela, and its causes.  (Pls.' Statement ¶ 35, Exs. A-E, R.)  The contents of each report relevant to the cause of Tara's illness are summarized below:

1.    May 15, 2000: Tara was healthy until July 26, 1999 when she developed vomiting, abdominal pain, and soft bowel movement after a dinner at Bennigan's.  At Mary Washington Hospital she was found to be in acute renal failure.  She was diagnosed with cortical necrosis.  The cause of her disease (etiology) is clearly related to gastroenteritis. According to her history, the only pertinent element of that history is her dinner at Bennigan's.  It is quite possible that food poisoning is the culprit.  However, this cannot be unequivocally determined.  (See Pls.' Statement ¶ 35, Ex. R) (emphasis added.)

2.    August 16, 2001 (a list of article titles and several abstracts on renal failure and renal cortical necrosis are attached to this report): Acute cortical necrosis is a disease most

_____

[6]Dr. Constantinescu testified that the opinions he gave at his deposition were rendered within a reasonable degree of medical probability, and that the methodology he used in reaching his opinions is reasonably relied upon by his peers.  (Millet Decl. ¶ 9, Ex. H at 54:4-13; 56:6-11, 14-22.)

[7]Dr. Constantinescu's reports are each styled as a letter.

often seen in newborns or in individuals in severe states of shock.  <u>The only supportive element of Tara's history is vomiting that occurred over a 24-36 hour period.</u>  This most likely caused a significant state of dehydration which led to a shunting of her blood from certain areas of the kidneys to other areas, causing the former areas to be devoid of blood, and ceasing filtration (one of the main elements of normal kidney function).  <u>She was evaluated for other possibilities of renal insufficiency such as lupus, other forms of vasculitis, and problems with blood clotting, with all test results coming back normal.</u>  <u>She denied drug use and the self-administration of chronic medications.</u>  <u>We are left with the most likely scenario: severe dehydration, which led to a state of shock, which led to acute cortical necrosis and renal insufficiency.</u>  (<u>See</u> Pls.' Statement ¶ 35, Ex. A) (emphasis added.)

3.  January 18, 2002 (addendum to the August 16, 2001 letter to clarify the possible clinical scenarios which led to Tara's acute renal failure): Based on the history and sequence of events, the most likely cause of acute renal failure was severe dehydration (the letter includes a more detailed description of the effect of dehydration on the kidneys), caused by vomiting which lasted about 24 hours.  Vomiting can be caused by several factors.  Based on the history, Tara was well until the morning of her departure to Florida.  The night before she had a salad, and nothing else.  <u>She has no history of hypertension, blurred vision, fever, no other ill contacts, no diarrhea prior, and no other complaints prior to this incident.</u>  <u>It is therefore within a reasonable medical probability that renal failure was caused by severe dehydration, likely caused by food ingestion.</u>  After kidney transplantation, Tara had HUS.  Retrospective analysis of her lab tests failed to elicit any abnormality compatible to this diagnosis at the initial presentation.  However, a slight abnormality in her vasculature could not be ruled out.  An offending agent must be present to develop the symptoms and abnormalities characteristic of HUS (the so-called "Hamburger Disease").  (Pls.' Statement ¶ 35, Ex. B) (emphasis added.)

4.  July 11, 2002: Tara lost the transplanted kidney within a month due to HUS.  It was speculated at the beginning that it could have been due to medications, however, now the possibility of a pre-existing abnormality of the inner lining of her blood vessels cannot be excluded, which could have also been responsible for the events seen at the initial presentation of acute renal failure.  Part of HUS is an inflammation of the pancreas, called pancreatitis.  Tara exhibits this complication.  In answer to the question, "[i]s it possible that the more recent events are related to her initial episode?", Dr. Constantinescu responded: "<u>it is with a reasonable medical probability that her initial episode (though atypical in presentation) has brought the whole spectrum of her disease to the forefront, and now we are observing a chronic inflammation of her blood vessels . . . ."</u>  (Pls.' Statement ¶ 35, Ex. C) (emphasis added.)

5.  July 30, 2004 (a list of case report abstracts concerning renal cortical necrosis and HUS are attached to this report): <u>After reviewing depositions taken between 2002 and 2003, and medical records from Newton-Wellesley Hospital,</u> Dr. Constantinescu states, "I still

think that Tara developed in 1999 acute renal failure due to a gastrointestinal illness that caused significant compromise to renal blood flow, with subsequent cortical necrosis. Even though the presentation was not typical for hemolytic uremic syndrome, the subsequent clinical course was suggestive of that condition, hence the well-known term 'atypical hemolytic uremic syndrome.'" Dr. Constantinescu notes that gastroenteritis can be the cause of acute cortical necrosis in about 4.4% of patients, that it is a rare, but not unheard of occurrence (even rarer in developed countries).[8]  He ends the report by stating:

> As pointed out on numerous occasions during the time I took care of Tara, the fact that she lost her kidney graft to hemolytic uremic syndrome, coupled with rejection, strengthens my opinion of atypical hemolytic uremic syndrome in her case.  I am not sure we will ever be able to determine with 100% certainty what triggered the cascade of events, however, based on the history, which sometimes is the only evidence a treating physician has, an ingestion was responsible for the gastro-intestinal symptoms which led to the acute renal dysfunction.  With reasonable medical probability, this is the scenario I suspected initially, and continues to be supported by the subsequent disease course.

(Pls.' Statement ¶ 35, Ex. D) (emphasis added.)

6.    November 29, 2004 (this letter is in response to a review by Dr. DuPont): At the beginning of the letter Dr. Constantinescu states:

> Dr. Dupont is concentrating on the fact that I did not provide supporting information about an enteric cause of acute cortical necrosis.  At the same time he did not provide an alternate explanation for her acute cortical necrosis.  When assessing the [sic] patients, clinicians draft a list of differential diagnoses with reasonable explanations (etiologies), then, if the etiology is not evident, exclusion strategies are employed.

He concludes by stating:

> Based on the history given by the patient and subsequent disease course, in the absence of an alternate pathogenic theory, it is within medical certainty that the only explanation for her acute cortical necrosis was her acute gastrointestinal illness.  Literature review supports the view that acute cortical necrosis occurs in a small portion of patients with HUS.  Even

---

[8]To support his proposition, Dr. Constantinescu points to an enclosed abstract of a study conducted in India of 113 patients diagnosed with acute renal cortical necrosis.  (See Pls.' Statement ¶ 35, Ex. D.)  The study found that acute gastroenteritis was the cause of acute renal cortical necrosis in 4.4% of the patients studied.  (Id.)

though she was uremic at the time, and we do not have enough
information to confirm hemolysis . . . one has to think about HUS in any
patient with acute cortical necrosis.  The fact that she developed HUS after
transplantation, made us think of initial mild HUS with the acute
gastrointestinal episode, and hypothesize that she had a more sensitive
endothelium than others [sic] patients, making the prodromal period less
likely to fit the typical pattern referred to in published articles and referred
to by Dr. DuPont.  <u>No alternate hypothesis was brought forth, reason [sic]
for my above lengthy clarification.</u>

(Pls.' Statement ¶ 35, Ex. E) (emphasis added.)

When evaluating whether <u>Daubert</u> and its progeny should exclude an expert's testimony

at trial, the expert's statements regarding causation are at the heart of the matter.  The following

excerpts from Dr. Constantinescu's deposition testimony speak to the issue of causation, and the

methodology he used in reaching his conclusions:

Q.       . .. [M]y question is, after you were familiar with this history, and you
         knew that [Tara] already had acute renal failure, what possible causes of
         that acute renal failure did you initially consider, concerning Tara?

A.       We know that <u>we have ruled out obstruction, blockage, based on
         sonograms.</u>
                 We know that <u>we have ruled out,</u> you know, <u>other diseases that can
         present such as a glomerular nephritis, for instance, or cancer, or a stone,
         based on the biopsy,</u> okay?
                 And then we went back and said okay, but what caused this acute
         cortical necrosis, and <u>we went back to the history,</u> and the only thing that
         there was suggested or could have led to this was a severe state of
         dehydration that was caused by her symptoms of vomiting.
                 Questionable, you know, with or without diarrhea, that there was
         not a major symptom in her case.
                 Vomiting was more – was the more disturbing symptom, and, plus,
         lack, lack of fluid intake.
                 And then going back and say, what caused her vomiting, and the
         only information that we had was what she ingested before, so that's – <u>this
         is how we went back, step by step, trying to figure out, was there any, any
         aggravating factor to her vomiting or what caused the vomiting, was there
         any medication, was there any, you know, any toxin, was there any viral
         infection,</u> was it, you know, was she – <u>was there any endemic condition,
         you know, in other words, a little epidemic of something,</u> you know, <u>a</u>

small group of people getting sick from the same virus or the same bacteria.

And then we went and reviewed the records from the doctors who saw her the first time.

It is very difficult for a physician who does not have firsthand contact with a patient in a particular situation to go back and review all those things, so we had to put everything together, it took us, you know, a few days before we realized that we don't have to do any other tests to – or we cannot do it, it's too late to do some tests, in terms of, you know, bacterial cultures, which are all negative or, you know, looking at drug tests, which have all been negative.

She's been in the hospital, so she didn't have any other – by the time she came to us, it was already a week after the initial presentation, and most of the medications, she would have ingested something, would have been out of her system at the beginning of it.

I don't recall if she had a drug test, a drug test over there in the hospital where she was in the emergency room, a drug screen of some sort. But this is to the best of our abilities to reach a diagnosis.

We had the most definitive proof, which was a real biopsy, and then a retrospective analyses [sic] of her symptoms led us to believe that the severity of the dehydration was responsible for this and then vomiting that led to the severe dehydration and then what caused the vomiting was the information that she gave us, what she ingested.

(Millet Decl., Ex. H at 18:13-17, 22-25; 19:1-21:11) (emphasis added.)

Q.   What other tests were performed which might indicate whether the kidney failure was likely to have been present prior to June 25th?

A.   To differentiate between "acute" and "chronic renal failure," one would have to look at anemia, one would have to look at acidosis, that's acid buildup in the bloodstream. . . .

Therefore, in the – with a lack of evidence for chronic disease, biochemically, as well as on biopsy, we were left with a diagnosis of acute onset renal failure.

As is stated here [referring to the discharge summary from Inova], acute renal cortical necrosis with acute renal failure.

Everything is acute, it just happened within twenty-four, forty-eight hours.

The suggestion here was, on the addendum to this discharge summary, that it was felt by the renal team that Tara should be evaluated for hypercoagulability and lupus anticoagulant.

Q.   Those tests were performed?

A.   Those tests were performed and they were negative . . . .

9

(Millet Decl. ¶ 9, Ex. H at 37:8-38:9) (emphasis added.)

**Cross-Examination:**

Q:     Based on your . . . training, education and experience as a clinician
        rendering differential diagnoses in your field of medicine, <u>is it more likely
        than not that it was the meal that Tara ate at Bennigan's that was
        responsible for the ideology of her illness</u>, rather than an allergic reaction
        of some kind?

A:     <u>I think the infectious ideology will be more likely than allergic ideology</u>.
        As I mentioned before, in medicine you can never be sure of anything,
        where <u>you would look at</u>, you know, <u>what's the most likely cause and
        what's the least likely cause, and this is one of those cases where we have
        to look at what's the most likely reason for her acute renal failure, and
        there was vomiting, what's the most likely reason for her vomiting is
        something that she ingested, what's the most likely possibility, is it
        infectious or allergic, and it's most likely is infectious [sic]</u>.

(Millet Decl. ¶ 9, Ex. H at 51:10-17, 51:21-52:8) (emphasis added.)

**Redirect Examination:**

Q.     You just used the term "diagnoses of exclusion" –

A.     Exclusion.

Q.     <u>Is that what you did here, you excluded other diagnoses, and then reached
        your diagnosis</u>–

A.     <u>Most likely ideology, yes.</u>

Q:     <u>And the most likely ideology is what</u>?

A:     <u>Ingestion, food ingestion that led to vomiting that led to severe
        dehydration, that led to acute cortical necrosis.</u>

Q:     Specifically what food?

A:     The information that, based on the information that I was given, the dinner
        within twelve hours prior to onset of symptoms.

Q:     The Caesar Salad at Bennigan's?

A:     Right.  If she had anything within two or three hours before or after, I have
        no way of knowing.  It was not available at the time and I'm not sure it can
        be established, you know, from what she –from what she told us.

Q:     And you don't know what she had, at any time that week, other than the
        Caesar Salad at Bennigan's?

A:     No.

(Millet Decl. ¶ 9, Ex. H at 57:4-58:6) (emphasis added.)

**<u>Dr. Dupont</u>**

Defendant has consulted two doctors in this matter.  Dr. Dupont is Defendant's expert in infectious disease.  (Pls.' Statement ¶ 47.)  He has thirty years of experience performing research in the field of enteric (intestinal) infections.  (Certification of David H. Sternlieb dated Nov. 18, 2005 ("Sternlieb Cert."), at ¶ 12, Ex. K.)  In preparation for his reports and deposition testimony, he reviewed Tara's medical records and deposition testimony, and Dr. Constantinescu's deposition testimony and reports.  (Sternlieb Cert. ¶ 12, Ex. K.)  In his opinion, Tara's acute renal failure occurred too quickly to be explained by the meal at Bennigan's.  (Sternlieb Cert. ¶ 12, Ex. K.)  He does not suggest an alternative cause or explanation.  (<u>See</u> Sternlieb Cert. ¶¶ 11-13, Exs. J-L.)  He disagrees with Dr. Constantinescu's diagnosis of atypical HUS.  (Sternlieb Cert. ¶ 11, Ex. J at 162:7-23.)  He does not believe that Tara had HUS of any kind (i.e., classic or atypical), but does not suggest an alternative diagnosis.  (Sternlieb Cert. ¶ 11, Ex. J at 162:7-23; <u>see also</u> Sternlieb Cert. ¶¶ 12-13, Exs. K-L.)

The following excerpts from Dr. Dupont's deposition testimony address the methodology of differential diagnosis, Dr. Constantinescu's credentials, and related issues:

> Q. What is a differential diagnosis?
>
> A. It means you have – you consider all of the possibilities to explain a clinical finding or condition, and you go about trying to exclude the ones in [sic] which you can.
>
> Q. . . . In your field of medical specialization, infectious disease, does it occur that more than one clinician can disagree on a differential diagnosis?
>
> A. Absolutely.
>
> Q. It happens all the time, right?
>
> A. Yes.
>
> Q. It doesn't make the physician or physicians that disagree with the other physician incompetent, does it?

11

A.      No.

Q.      And it doesn't make their methodology subject to questions, does it?

A.      No.

(Sternlieb Cert. ¶ 11, Ex. J at 39:23-40:17.)


Q.      . . . Sir, have you ever diagnosed a patient with a food-borne related illness
        without ever actually speaking to her or examining the patient?

A.      Sure.

Q.      That was based on what?

A.      Epidemiologic, clinical and laboratory evidence.

(Sternlieb Cert. ¶ 11, Ex. J at 50:16-22.)


Q.      Do you have any reason to question [Dr. Constantinescu's] credentials in
        medicine?

A.      No.

Q.      Do you have reason to question his education and competence in the
        treating of pediatric patients?

A.      Not at all.

(Sternlieb Cert. ¶ 11, Ex. J at 51:23-52:4.)

## **Dr. Trachtman**

Dr. Trachtman is Defendant's expert in pediatric nephrology.  (Pls.' Statement ¶ 41.)  He

and Dr. Constantinescu are colleagues.  (Pls.' Statement ¶ 41.)  He reviewed Tara's medical

records in preparing his report.  (Sternlieb Cert. ¶ 10, Ex. I.)  In his opinion, the meal Tara ate at

Bennigan's could not have been contaminated with a Shiga-toxin producing strain of E. coli, and

she did not develop a classical case of diarrhea associated HUS.  (Sternlieb Cert. ¶ 10, Ex. I.)  Dr.

Trachtman does not suggest an alternative cause of Tara's initial gastrointestinal illness.  (See

Sternlieb Cert. ¶¶ 9-10, Exs. H-I.)  At his deposition, he testified that he agrees with Dr.

Constantinescu's diagnosis of atypical HUS.  (Sternlieb Cert. ¶ 9, Ex. H at 85:22-25; 86:3-7.)  He

also testified that he agrees with Dr. Constantinescu's differential diagnosis, and that Dr. Constantinescu's methodology is commonly used, and his conclusions are reasonable.  (Sternlieb Cert. ¶ 9, Ex. H at 89:22-24; 90:2-12; 106:9-18, 21-25; 107:3, 21-25.)

The following excerpts from Dr. Trachtman's deposition testimony address the methodology of differential diagnosis, Dr. Constantinescu's conclusions, and Dr. Trachtman's diagnosis:

Q.      . . . [C]an you please explain so that a lay person with little or no medical background could understand what a differential diagnosis is, please?

A.      My understanding of a differential diagnosis is, as I use it, is that when you encounter a new case, there are going to be various facts that the patient reports to you, the signs and the symptoms that they have encountered during the development of their illness, and there will be some early laboratory data that is collected during the evaluation of that child.

With that initial data, there are going to be a list of potential possible explanations for the child's illness and that list of possible diseases constitutes what I call – it's called a differential diagnosis.

Q.      Sir, is it a fair statement that differential diagnosis is a widely-acceptable means of rendering diagnostic opinions in clinical practice settings?

A.      It's not a means of getting a final diagnosis.  It's the deductive way that doctors operate to narrow down the possibilities.  So, in other words, medicine is a deductive process.  You go from the general, the specific as to – it's inductive, general to specific.

So it's generally the way most doctors are trained to think, from a list of many possibilities trying to narrow it down to the one or two or whatever number that are applicable to the case at hand.

Q.      So it's sort of like the process of exclusion.  You exclude certain possibilities and try to narrow down to the probabilities or the most probable phenomenon?

A.      Yes.

(Sternlieb Cert. ¶ 9, Ex. H at 21:17-22:23) (emphasis added.)

Q.      And whether or not you actually agree with Dr. Constantinescu, he may be correct in his conclusion, is that correct?

A. <u>Yes</u>.

Q. And is it your conclusion as well that Tara's kidney transplant failed because of [sic] recurrence of atypical HUS?

A. The way [Dr. Constantinescu] describes it, it's consistent with that, yes.

Q. And that's within a reasonable degree of medical probability, sir?

A. Yes.

. . . .

Q. <u>So that we can establish for the record, you agree with Dr. Constantinescu that this patient, Tara Winnicki, is an unfortunate victim of atypical HUS, is that correct?</u>

A. <u>That would be my best – that would be my best working diagnosis, yes</u>.

Q. And that would be within a reasonable degree of medical probability, correct?

A. Yes.

(Sternlieb Cert. ¶ 9, Ex. H at 83:12-15, 19-25; 84:1; 85:22-25; 86:3-7) (emphasis added.)

## <u>Summary of the Relevant Procedural History</u>

Defendant filed its motion to bar Dr. Constantinescu's testimony and for summary judgment on the following ground: the opinions expressed by Dr. Constantinescu on the issue of causation are inadmissible, pursuant to Rule 702 and <u>Daubert</u>, because they lack adequate foundation, are speculative, and scientifically unreliable.  In its reply, Defendant narrowed the focus of its argument to two main points: 1) Dr. Constantinescu's opinion is based solely upon the temporal order of events, and an opinion offering a differential diagnosis that rests solely or primarily upon timing, is an inadmissible net opinion because it fails to meet the requirements of Rule 702 and <u>Daubert</u>; and 2) Dr. Constantinescu did not perform a proper differential diagnosis in coming to his conclusion that the salad was the cause of Tara's subsequent medical problems.  This Court heard oral argument on January 10, 2006.  At oral argument, Defendant focused its argument on Dr. Constantinescu's failure to conduct a proper differential diagnosis in coming to

14

his conclusion that the salad Tara ate at Bennigan's was the cause of Tara's subsequent medical problems.

## DISCUSSION

To prove a claim of negligence in New Jersey, "a plaintiff must show that the defendant's actions were the proximate cause of his or her injury."  See Creanga v. Jardal,185 N.J. 345, 354 (2005) (citation omitted).  "Expert medical testimony often is used to demonstrate a causal link between the defendant's allegedly negligent conduct and the plaintiff's injury."  Id. (citations omitted).

## A.    Standard of Review

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit.  See Anderson, 477 U.S. at 248.  The moving party must show that, if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

 Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question."

15

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing

party must set forth specific facts showing a genuine issue for trial and may not rest upon the

mere allegations or denials of its pleadings.  See Sound Ship Bldg. Co. v. Bethlehem Steel Co.,

533 F.2d 96, 99 (3d Cir. 1976), cert. denied, 429 U.S. 860 (1976).  At the summary judgment

stage, the court's function is not to weigh the evidence and determine the truth of the matter, but

rather to determine whether there is a genuine issue for trial.  See Anderson, 477 U.S. at 249.  In

doing so, the court must construe the facts and inferences in the light most favorable to the non-

moving party.  See Wahl v. Rexnord Inc., 624 F.2d 1169, 1181 (3d Cir. 1980).

**B.      Standard of Admissibility for Expert Testimony**

Defendant challenges Dr. Constantinescu's testimony, arguing that his opinions on the

issue of causation are speculative, scientifically unreliable, lack adequate foundation, and should

be excluded under Rule 702, as interpreted by the Supreme Court of the United States in Daubert

v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Rule 702 permits the admission of

expert testimony if "scientific, technical or other specialized knowledge will assist the trier of

fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702.

In Daubert, the Court explored the "gatekeeping role" that trial judges serve to ensure that

expert testimony admitted under Rule 702 is both relevant and reliable.  See Daubert, 509 U.S. at

597-98.  The Daubert Court found that the Federal Rules of Evidence were inconsistent with–and

thus displaced–the rigid "general acceptance" test that had previously controlled the admission of

expert opinions, and held that a more flexible inquiry was appropriate.  See id. at 588-89.  Under

this approach, the trial court should consider factors such as whether the theory or technique can

be (and has been) tested; whether it has been subjected to peer review and publication; whether

the technique has a high known or potential rate of error; whether standards controlling the technique's operation exist and are followed; and whether the theory or technique enjoys general acceptance within the relevant community.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999) (summarizing Daubert).

The Third Circuit has provided further guidance for the exercise of the gatekeeper role.  It has noted that Rule 702 embodies a liberal admissibility requirement and boils down to two major requirements: that the proffered expert be qualified to express an expert opinion and that the proffered opinion be reliable.  See In re TMI Litig., 193 F.3d 613, 664 (3d Cir. 1999) (discussing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994) ("Paoli")).[9]  An expert opinion is "reliable under Rule 702 if it is based on 'good grounds,' i.e., if it is based on the methods and procedures of science. . . .  The grounds for the expert's opinion merely have to be good, they do not have to be perfect."  Paoli, 35 F.3d at 744.  Expert testimony, like all admissible evidence, is subject to being tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  See Daubert, 509 U.S. at 596.

This case is not an instance where a standard Daubert analysis applies.[10]  Instead, the focus is on the manner in which Plaintiffs' expert performed the methodology he used in reaching his conclusions.  Here, the crux of the issue is whether Plaintiffs' expert performed a

---

[9]There is also a "fit" precondition to admissibility, which requires a connection between the proffered expert testimony and the disputed factual issues in a particular case.  See Paoli, 35 F.3d at 742-43 (citing Daubert and United States v. Downing, 753 F.2d 1224, 1237 (3d Cir. 1985)).

[10]As the Third Circuit noted in Paoli, "most of the Daubert factors–testability, general acceptance, peer review, and degree of production errors" are only of limited help in assessing whether a differential diagnosis in a particular case is reliable.  35 F.3d at 758.

reliable differential diagnosis in reaching his conclusions, and whether his conclusion as to causation is improperly based on a temporal relationship.  Upon review of the parties' submissions, and having heard oral argument, this Court finds that Dr. Constantinescu's differential diagnosis was conducted in a reliable manner, and his conclusion as to causation was not improperly based on a temporal relationship.  Defendant's motion to bar Dr. Constantinescu's testimony is denied.

### 1.   Dr. Constantinescu's Differential Diagnosis

Defendant argues that Dr. Constantinescu did not perform a proper differential diagnosis in reaching his conclusion that the salad was the cause of Tara's subsequent medical problems. Defendant further argues that an expert must show that he has a solid basis for "ruling in" the cause he ultimately attributes to being the cause of a plaintiff's problem, and he also must show that in performing a differential diagnosis, he accounted for other potential causes of the condition, and properly excluded them.[11]

Defendant asserts that a thorough review of Dr. Constantinescu's six reports and deposition testimony reveal no evidence of an explanation of the methodology he employed in determining that the salad was the cause of Tara's illness.  Defendant argues that Dr. Constantinescu did not "rule in" all the potential causes of Tara's vomiting, and he failed to "rule out" any potential causes.  Defendant also argues that although Dr. Constantinescu may have

---

[11]Defendant argues that a properly performed differential diagnosis consists of two separate and distinct steps: (1) the expert rules in all plausible causes for the patient's condition by compiling a comprehensive list of hypotheses; and (2) the expert then rules out those causes that did not produce the patient's condition by engaging in a process of elimination based on a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case.  See Creanga v. Jardal,185 N.J. 345, 356 (2005).

performed a proper differential diagnosis in reaching his conclusion that vomiting led to Tara's dehydration, he did not perform a proper differential diagnosis in reaching his conclusion that the salad caused Tara's vomiting.

Defendant argues that the medical history Dr. Constantinescu took from Tara and/or her parents was incomplete because he failed to ask questions regarding what Tara ate before the salad at Bennigan's. Defendant asserts that this incomplete medical history prevented Dr. Constantinescu from performing a proper differential diagnosis in reaching his conclusion that the salad caused Tara's vomiting, because he was not able to consider (i.e., "rule in"), the meals Tara consumed prior to the salad, as possible causes of her illness.

Plaintiffs argue that in his deposition testimony and in his reports, Dr. Constantinescu explains his methodology and use of differential diagnosis. Plaintiffs assert that he conducted an exhaustive and in depth review and analysis of Tara's hospital records, all available laboratory data, and tests (i.e., toxicology screens, pathology reports, ultrasound, CT scans, and MRI reports), and he examined and treated Tara extensively, beginning in early July 1999, and continuing for several years thereafter. Plaintiffs further argue that Dr. Constantinescu performed a reliable differential diagnosis because he considered and excluded (i.e., "ruled in and out") other plausible causes for Tara's illness other than the Bennigan's meal in question.

Plaintiffs assert that neither of Defendant's experts challenge Dr. Constantinescu's methodology, and in fact, Dr. Trachtman agrees with Dr. Constantinescu's differential diagnosis. Plaintiffs further assert that despite Defendant's issues with Dr. Constantinescu's conclusions, Defendant has failed to propose, (through its experts), any alternate causes of Tara's illness. Plaintiffs argue that the grounds upon which Dr. Constantinescu's opinions rest are certainly

19

within the "guideposts" of <u>Daubert</u> and <u>Paoli</u>, and Defendant's criticisms of Dr. Constantinescu's opinions and methodology are an appropriate subject for cross-examination before the jury.

The Third Circuit has recognized "differential diagnosis" as a technique that involves assessing causation with respect to a particular individual.[12] <u>Kannankeril v. Terminix Int'l, Inc.</u>, 128 F.3d 802, 807 (3d Cir. 1997) (citing <u>Paoli</u>, 35 F.3d at 758). "The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests." <u>Id</u>. (citing same). It is not required that a doctor utilize all of these techniques in order for the doctor's diagnosis to be reliable. <u>Id</u>. (citing <u>Paoli</u>, 35 F.3d at 759). "A differential diagnosis may be reliable with less than all the types of information set out above." <u>Id</u>. (citing same).

Dr. Constantinescu reviewed Tara's hospital records from Mary Washington Hospital and Inova, the two hospitals in Virginia where Tara was seen in June 1999. (<u>See</u> Pls.' Statement ¶ 35, Exs. A-E, R; Millet Decl. ¶ 9, Ex. H at 7:20-25.) He reviewed the historical information contained in the records as well as all available laboratory data, toxicology screens, pathology reports, ultrasound, CT Scans, and MRI reports. (<u>See</u> Pls.' Statement ¶ 35, Exs. A-E, R; Millet Decl. ¶ 9, Ex. H at 11:9-14; 18:13-17, 22-25; 19:1-21:11; 22:13-23:15; 37:8-38:9; 52:23-53:16.) He physically examined Tara, took her medical history, and treated her extensively from July 1999, until her death in 2003. (<u>See</u> Pls.' Statement ¶ 35, Exs. A-E, R; Millet Decl. ¶ 9, Ex. H at 16:22-17:1.) He considered alternative causes of her illness (i.e., whether her vomiting was

---

[12]In <u>Heller v. Shaw Industries, Inc.</u>, the court noted that "differential diagnosis 'consists of a testable hypothesis,' has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context." 167 F.3d 146, 154 (3d Cir. 1999) (citing <u>Paoli</u>, 35 F.3d at 742 n.8).

caused by a medication, a toxin, a viral infection, allergic reaction, or a small viral or bacterial epidemic), and the fact that she was healthy before the onset of her illness.[13]  (See Pls.' Statement ¶ 35, Exs. A-E, R; Millet Decl. ¶ 9, Ex. H at 18:13-17, 22-25; 19:1-21:11; 51:10-17, 51:21-52:8; 57:4-58:6.)  As part of his differential diagnosis, Dr. Constantinescu considered the salad as a possible cause of Tara's illness because she suffered from an acute onset of gastrointestinal dysfunction, which he believed had to be brought on by something she ate within a short period of time (i.e., approximately twelve hours).  (Millet Decl. ¶ 9, Ex. H at 25:5-26:4.)  Based on the acute symptoms she presented, he did not believe that the meals she had consumed prior to the salad were plausible causes of such an abrupt onset of acute gastrointestinal dysfunction.  (Millet Decl. ¶ 9, Ex. H at 25:5-26:4.)

In Heller v. Shaw Industries, Inc., the court determined that Dr. Papano (plaintiff's expert witness), had engaged in a differential diagnosis in a reliable manner, where he ordered standard laboratory tests, physically examined the plaintiff, took medical histories, and considered alternative causes of the plaintiff's illness.  167 F.3d 146, 156 (3d Cir. 1999).  Here, Dr. Constantinescu has done no less.  Like Dr. Papano, Dr. Constantinescu physically examined the plaintiff, took her medical history, and considered alternative causes of her illness, all in the context of having conducted a thorough review of her hospital records, laboratory data, and test results.  More importantly, Dr. Constantinescu treated Tara as his patient for over two years.

Yet Defendant contends that Tara's incomplete medical history prevents Dr. Constantinescu from performing a proper differential diagnosis because he could not consider the meals Tara consumed prior to the salad as possible alternative causes of her illness.  In essence,

---

[13]See supra p. 6 at ¶ 3, pp. 8-9.

Defendant argues that Dr. Constantinescu's differential diagnosis and conclusions on causation are fatally flawed because he did not consider all possible alternative causes of Tara's illness.

"A medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness." Heller, 167 F.3d at 156. Therefore, in conducting a reliable differential diagnosis, Dr. Constantinescu was not required to rule out all alternative possible causes of Tara's illness. See Heller, 167 F.3d at 156. "[O]nly 'where a defendant points to a plausible alternative cause and the doctor offers *no* explanation for why he or she has concluded that was not the sole cause'" is that doctor's methodology considered unreliable. Heller, 167 F.3d at 156 (citing Paoli, 35 F.3d at 759 n.27).

Here, Defendant's experts fail to offer any alternative causes for the onset of Tara's illness. Although Dr. Dupont states in his report that he believes Tara's acute renal failure occurred too quickly to be explained by the meal at Bennigan's, he offers no other explanation. (Sternlieb Cert. ¶ 12, Ex. K.) Furthermore, Dr. Dupont states in his deposition testimony that doctors can often disagree on properly conducted differential diagnoses.[14] (Sternlieb Cert. ¶ 12, Ex. J at 39:23-40:17.)

Dr. Trachtman also fails to offer any alternative causes for the onset of Tara's illness. (See Sternlieb Cert. ¶¶ 9-10, Exs. H-I.) In fact, Dr. Trachtman not only agrees with Dr. Constantinescu's diagnosis of atypical HUS[15], he states in his deposition testimony that he agrees with Dr. Constantinescu's differential diagnosis. (Sternlieb Cert. ¶ 9, Ex. H at 83:12-15, 19-25; 84:1; 85:22-25; 86:3-7.) The following exchange took place at Dr. Trachtman's deposition:

---

[14]See supra pp. 11-12.

[15]See supra p. 14.

22

Q. . . . [A]t this point <u>you're not in a position to disagree with Dr. Constantinescu's differential diagnosis, is that correct</u>?

A. <u>We basically agree on the differential diagnosis</u>. We may – I'm not sure what he said. I'm not sure whether we can – I don't think that I can – that anybody can confidently identify the exact trigger, the exact trigger to this young girl's acute severe renal failure in the last week in June.

Q. But as you stated a few moments earlier, <u>you're not in a position based on the materials supplied to you to disprove or dispute his conclusion, that being Dr. Constantinescu</u>?

A. <u>That's correct</u>.

(Sternlieb Cert. ¶ 9, Ex. H at 89:22-24; 90:2-12) (emphasis added.)

Dr. Trachtman also testified that Dr. Constantinescu's methodology is commonly used by physicians, and he believes that Dr. Constantinescu was reasonable in reaching his conclusions. (Sternlieb Cert. ¶ 9, Ex. H at 106:9-18, 21-25; 107:3, 21-25.)  The following exchange took place at Dr. Trachtman's deposition:

Q. <u>You're saying that Dr. Constantinescu is being reasonable in his conclusion</u>. I'm characterizing your answer just a moment ago as basically a summary of your testimony up to now.

A. <u>Yes. That's right</u>.

Q. Is that all right?

A. That's absolutely true.

Q. So in being reasonable, Dr. Constantinescu relied on data available to him to lead to a reasonable conclusion; is that a fair –

A. I don't think data. It's his clinical impression of how the story evolved.

Q. <u>And physicians make clinical impressions in the same methodology employed by Dr. Constantinescu every day, don't they</u>?

A. <u>Yes. Yes</u>.

(Sternlieb Cert. ¶ 9, Ex. H at 106:9-18, 21-25; 107:3) (emphasis added.)

Like the doctor in <u>Kannankeril</u>, Dr. Constantinescu has not been challenged by the presentation of alternate diagnoses by other physicians. 128 F.3d at 808.  Furthermore, Defendant, "in challenging [Dr. Constantinescu's] opinion, has not raised any other theory of

causation for [Tara's acute renal failure]."  Id.  As in Kannankeril, "[t]he record in this case is

devoid of any alternate diagnosis which [Dr. Constantinescu] ignored or failed to consider."  Id.

Dr. Constantinescu's reports and deposition testimony make clear that he considered and

excluded other potential causes for Tara's illness.[16]  Contrary to Defendant's arguments, Dr.

Constantinescu's causation conclusion "should not be excluded because he . . . failed to rule out

every possible alternative cause of [Tara's] illness."  Heller, 167 F.3d at 156.  Dr. Constantinescu

has good grounds for his conclusion, and any perceived weakness in his analysis goes to the

weight, rather than the admissibility, of his testimony.  See Kannankeril, 128 F.3d at 808.

Therefore, this Court finds that Dr. Constantinescu's differential diagnosis was conducted in a

reliable manner, and his testimony cannot be excluded on the grounds Defendant asserts.[17]  See

Heller, 167 F.3d at 156.

---

[16]See supra pp. 5-10.

[17]Defendant has also made an issue of the fact that Plaintiffs' expert is not an expert in the
field of food handling or infectious disease.  Defendant argues that Plaintiffs' expert's testimony
will not be helpful to the jury because he cannot offer any testimony as to the testing performed
on the remains of the salad, nor offer testimony regarding analysis of stool samples.  Despite this
argument, Defendant concedes that no one can offer such testimony because such testing and
analysis was not performed.  Furthermore, Defendant fails to point to any requirement that in
order for a patient's treating physician to testify regarding the most likely cause of their patient's
illness, the physician must be an expert in the field of food handing or infectious disease.
Defendant is free to proffer experts in these areas.  As a basis for barring Plaintiffs' expert's
testimony, Defendant's argument is without merit.
        Defendant has also asserted that Plaintiffs' expert's reports lack evidentiary value because
they do not cite authority supporting his opinions.  As a preliminary matter, it should be noted
that two of Dr. Constantinescu's reports reference published medical literature.  (See Sternlieb
Cert. ¶¶ 2, 5, Exs. A, D.)  Furthermore, medical experts need not "always cite published studies
on general causation in order to reliably conclude that a particular object caused a particular
illness."  Heller, 167 F.3d at 155.

2.      **Temporal Relationship**

Defendant argues that Dr. Constantinescu's opinion that the salad caused Tara's illness "is based solely upon the chance happening that Tara ate the salad the night before she began experiencing vomiting."  (Def.'s Reply Br. 15.)  Defendant contends that Dr. Constantinescu's opinion is based solely upon the temporal order of events, and that an opinion offering a differential diagnosis that rests solely or primarily upon timing, is an inadmissible net opinion. In <u>Dawson v. Bunker Hill Plaza Associates</u>, 289 N.J. Super. 309, 323 (N.J. Super. 1996), the New Jersey Appellate Division explained the "net opinion rule":

> Under New Jersey law, an expert's opinion must be based on a proper factual foundation.  In other words, 'expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him [or her] to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture.'  This prohibition against speculative expert testimony has been labeled by modern courts as the 'net opinion rule'.  Under this doctrine, expert testimony is excluded if it is based merely on unfounded speculation and unquantified possibilities.

<u>Id</u>.  (citations omitted.)  Here, the "net opinion rule" is inapplicable for two reasons.  First, "the net opinion rule" is not a federal evidentiary rule and does not form a part of the <u>Daubert</u>/<u>Kumho</u> analysis.  Second, this Court has already determined that there is sufficient evidence in the record for Dr. Constantinescu's conclusions, and any perceived weakness in his analysis goes to the weight, rather than the admissibility, of his testimony.  Therefore, Defendant's net opinion argument is not only inapplicable to this matter, it is also without merit.

Defendant further asserts that opinions based solely upon temporal order lack reliability and should be excluded.  Defendant contends that Dr. Constantinescu lacks a "solid basis" for considering the salad as the cause of Tara's illness because he cannot offer any testimony

regarding what, if anything, was wrong with the salad, and how it led to Tara's illness, other than a temporal relationship.

"A number of courts, including our own, have looked favorably on medical testimony that relies heavily on a temporal relationship between an illness and a causal event." Heller, 167 F.3d at 154 (citing Zuchowicz v. United States, 140 F.3d 381, 385-87 (2d Cir. 1998)); Kannankeril, 128 F.3d at 809). "The temporal relationship will often be (only) one factor, and how much weight it provides for the overall determination of whether an expert has 'good grounds' for his or her conclusion will differ depending on the strength of that relationship." Heller, 167 F.3d at 154. Where a temporal relationship is strong and forms part of a standard differential diagnosis, it will fulfill many of the Daubert/Paoli factors. See Heller, 167 F.3d at 158 (citing Paoli, 35 F.3d at 742 n.8).

As discussed above, in performing his differential diagnosis, Dr. Constantinescu considered the salad as a possible cause of Tara's illness because she suffered from an acute onset of gastrointestinal dysfunction, which he believed had to be brought on by something she ate within a short period of time (i.e., approximately twelve hours). (Millet Decl. ¶ 9, Ex. H at 25:5-26:4.) Based on the acute symptoms she presented, he did not believe that the meals she had consumed prior to the salad were plausible causes of such an abrupt onset of acute gastrointestinal dysfunction. (Millet Decl. ¶ 9, Ex. H at 25:5-26:4.) Dr. Constantinescu also considered and excluded other possible causes of Tara's vomiting (i.e., medication, toxins, viral infection, allergic reaction, or a small viral or bacterial epidemic).[18] Dr. Constantinescu found no

––––––––––––––––––––

[18]See supra pp. 8-9.

basis in Tara's records to conclude that these other potential causes were responsible for Tara's acute gastrointestinal dysfunction.  Although Dr. Constantinescu testified that he did not know what was wrong with the salad, he did consider what could have been wrong with it, in light of the course of Tara's illness.  (Millet Decl. ¶ 9, Ex. H at 30:7-31:3; 31:16-32:4.)  Dr. Constantinescu's differential diagnosis led him to the conclusion that the most likely cause of Tara's vomiting was something she ingested within a short period of time prior to the onset of her symptoms, and based on the information provided to him, the meal closest in time to the onset of her symptoms, was the salad she ate at Bennigan's.

Here, the temporal relationship is strong and forms a part of Dr. Constantinescu's differential diagnosis.  It is one of several factors that Dr. Constantinescu considered in reaching his conclusion.  Defendant has pointed to no requirement that Dr. Constantinescu know exactly what was wrong with the salad in order to consider it as a possible cause of Tara's illness.  Furthermore, a strong temporal relationship between a plaintiff's exposure to a particular object and subsequent illness, has been considered a proper basis for an expert opinion on causation.  See Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999); see also Heller, 167 F.3d at 154.  Therefore, Dr. Constantinescu's testimony cannot be excluded on this basis.  As discussed above, in reaching his conclusion, Dr. Constantinescu considered and excluded other potential causes for Tara's illness.  Thus, his opinion does not rest solely or primarily upon timing.  Furthermore, Defendant's assertion that Dr. Constantinescu's opinion is an inadmissible net opinion is without merit.

3.    **Defendant's Motion for Summary Judgment**

Defendant's summary judgment motion is premised upon the absence of reliable, admissible expert testimony as to the issue of causation. Defendant asserts that without Dr. Constantinescu's testimony, Plaintiffs' claims fail as a matter of law because expert opinion is essential for establishing causation in this case, and Dr. Constantinescu is Plaintiffs' only proffered expert witness. In light of this Court's conclusion that Plaintiffs have provided admissible expert testimony concerning the issue of causation, Defendant's motion for summary judgment must be denied.

## CONCLUSION

For the reasons set forth above, this Court denies Defendant's motion to bar the testimony of Plaintiffs' expert, Dr. Constantinescu, and denies Defendant's motion for summary judgment.


Dated: February 9, 2006


 S/Joseph A. Greenaway, Jr.          

JOSEPH A. GREENAWAY, JR., U.S.D.J.

28